Thank you, Your Honor. May it please the Court, Rich Busse for the Plaintiff Appellant. I would like to reserve five minutes for rebuttal. In this case, Mr. Canio, Plaintiff Supervisor, was the individual Plaintiff was relying upon to protect him from sexual harassment. My client, Mr. Hubbard, didn't have hiring and firing authority. He didn't even have disciplinary authority. So he had to go up the line to report sexual harassment, which is what he did. We have in this case a situation in which Mr. Canio also knew that my client had to work with Mr. Marshall, who was the Transportation Supervisor, and also Mr. Felty, who was a truck driver. In this case, there was evidence of sexual harassment by both of those gentlemen. Mr. Marshall, who would make gross sexual statements to Mr. Hubbard, and Mr. Felty, who would come on to him, ask him his sexual preference, tell him his own, make comments about his physical appearance, invade his space, and ultimately ask him for a relationship. Mr. Kagan. And that relationship piece was seems very silly to me. I mean, I don't think the relationship piece seemed plainly to not be a sexual relationship in the context of a major dispute going on and attempts to mediate the relationship, which in ordinary language in an ordinary workplace means how we get along in the workplace. It could have that meaning in this, in the context of the events as they occurred, with plaintiff continually going to his supervisor and human resources to record his discomfort about Mr. Felty's behavior towards him, and with the predictable result when neither his supervisor, who told him just be the bigger man and ignore it, nor human resources, who said, well, if there's no physical contact, just don't retaliate against this individual, when Mr. Johnson admitted that in his mind he thought the perpetrator was the protected individual, led to an escalation by Mr. Felty, who asked him then for that relationship. Mr. Hubbard went back to human resource to report it a second time. No action was taken then. At that continual rejection by Mr. Hubbard of Mr. Felty's advances, Mr. Felty became more aggressive. He would try to cut him off with the truck trailer. He would talk to him about how he liked, how Mr. Hubbard liked genitalia and whether he liked large genitalia, and told him he liked large genitalia. At that, Mr. Hubbard couldn't take it anymore, and he went to Mr. Canio a final time just about a month prior to his constructive discharge and said, what do I have to do to get this to stop? Hire an attorney. And then the employer took the only action it did during that entire course of conduct, which is to transfer Mr. Hubbard to a site that would have exposed him to Mr. Felty in a more private setting at night with only three to six employees. Mr. Hubbard objected to that action. Mr. Canio would not relent, and Mr. Hubbard reasonably resigned at that point. So we have evidence of a hostile sexual working environment. We have evidence of the employer's utter failure to take any action to protect the employee who was complaining about it. And we ultimately have the evidence of retaliation against the complainant who invoked the threat of hiring an attorney against the employer to garner the protection the employer was not providing. And in this case, then, the Court erred in not allowing Mr. Hubbard his day in court. And there should be no higher bar for a man than a woman when it comes to sexual harassment. And what's peculiar about this case is that one has the sense of the leave Marshall aside, but with regard to Felty, that these people – because he wasn't really complaining that much about Marshall. I mean, he seemed to say, oh, you know, Marshall's just kind of, you know, a gross jerk. But that wasn't really bothering him particularly. Felty was the one that was bothering him. He did testify that he did go to Mr. Canio on two occasions to complain about Mr. – Right. Canio says no, but that's a matter for trial. That I don't want to hear about. All right. So then we have – but what we do have is a situation where you have two employees who obviously aren't getting along and really don't like each other. And it's really an interpretive question. Maybe this is a reason why you do go to trial and don't do it in summary judgment. You know, whether whatever Felty was saying was being taken seriously as sexual harassment or just as, you know, annoying, obnoxious behavior, no different than if he had been making remarks about something else. He was just – they just didn't like each other and were annoying each other. Well, there is no evidence that Mr. Hubbard engaged in – Well, there is. Felty says he was cursing at him and he was being rude to him and so on. So it was in that context that all this occurred. So it's like the sexual content is almost sort of incidental to the fact that these people were simply at each other. Well, intent in most cases, and it should be in this case as well, is normally a jury question. And whether or not Mr. Felty was engaging in this conduct because of Mr. Hubbard's sex should be something for a jury to consider given the rather personal attention and peculiar sexual orientation to the type of attention that was being given to Mr. Hubbard. So we would argue that that should be a jury question, Your Honor. But it would be a jury question. Oh, absolutely. It would be a question of – if the jury interpreted the situation as I described it, it wouldn't be a Title VII case. I think that's right. The jury would be allowed to consider that evidence and see if these were two guys just messing around. And even if he was saying all the stuff he was saying, if it was not meant to and wasn't being taken as any sort of – as being sexual, but just as being, you know, I'm – this is how guys annoy each other. I would fully expect that defense to be presented. Finally, Your Honor, with respect to the argument that Plaintiff failed to exhaust administrative remedies, Plaintiff did make the requisite administrative filings. The administrative agencies did exercise their administrative authority to issue right-to-sue letters. And the fact that there was a previous state court filing for wrongful constructive discharge is of no moment because the trial court correctly ruled that that was not the same matter. The wrongful constructive discharge case was based upon the Holin v. Sears wrongful constructive discharge public policy tort, which is not the same as the statutory claim under 659A.885. Even if it were, I guess I don't quite understand why, if he filed prematurely, he couldn't then still exhaust and then go forward once he did exhaust. Is there some reason why? Our position is that it was not a premature filing. I understand it, but suppose it was. Suppose it was. Suppose he – why would that preclude him, if he was otherwise timely, from exhausting thereafter and going forward? It probably wouldn't because their argument only goes to the state court filing when the issue is whether or not – and that would have nothing to do with the Title VII claim. But – Except that you have to exhaust the state agency, but I don't see why that would preclude you from doing it. Is there some reason in state law that I'm missing why once you file the state cause of action you can't go to the state agency? There is a state statute that says if you file in state court – you don't have to exhaust in the state system here in Oregon. Right. But if you file on the same matter in state court, then you cannot thereafter file your state court view of labor complaint. I see. Okay. But the Court directly ruled that what was filed in state court was not pursuant to the Oregon State Discrimination Statute or 659A885. It was pursuant to the Oregon common law of public policy toward wrongful discharge, which doesn't have injunctive relief. It doesn't have attorney's fees. There was no claim for injunctive relief or attorney's fees in that previous court – state court filing. Conversely, the state court filing had a claim for emotional distress damages. It reserved the right to file for punitive damages, which would not be within the purview of the bully Bureau of Labor and Industries and state administrative complaint. They are two different claims in the court. Well, to go back to what seems to be the basic question here, which is whether there was a hostile work environment. And I guess you would say, well, that's not the only question, that there's still a retaliation claim. But as to whether there's a hostile work environment, what case would you rely on as being closest in terms – I mean, here we had no physical attacks. We had no touching. We had, you know, some statements that seemed fairly innocuous, like you have a nice tan and stuff like that. We have this one episode with the truck and a couple statements about genitalia, and I want you – what case is there which has found that sort of – that degree of repetition and degree of intrusiveness to be sufficient? Nichols is the case cited in our reply brief as the closer case involving the campaign of taunts directed at the plaintiff designed to humiliate and anger him. Well, don't forget that this person who is doing it is also essentially a subordinate to him, which is of some relevance as well. It wasn't a superior and it wasn't even a co-employee of equal stature. It was really a subordinate. It was, but, of course, Title VII does not – does not – But insofar as there's some power relationship problems making – I mean, inherent in hostile environment cases is the notion that you are beholden to the person and therefore in some way, you know, prevented from fighting back, and that isn't true in this circumstance. Well, it isn't except that because of the peculiarity of the organizational hierarchy, even though he was nominally a supervisor, he had no disciplinary authority. He had no hiring and firing authority. The guy wasn't even in his same organizational department. He was in the transportation department, and so my client couldn't – couldn't – he had to involve his supervisor, Mr. Canio, for help and assistance in securing relief. Was the person – the harasser in Nichols a supervisor of the person being harassed? Pardon? In Nichols, was the person who was harassing a supervisor of the person being harassed? I do not know. Okay. But with respect to Title VII, the employer is responsible not only for a supervisory co-worker or subordinate in place, they're even responsible for the actions of third parties that come on the property with the employer's knowledge who were sexually harassing the employee. So the fact that this person is a – an organizationally speaking, a lower-level employee, really has no bearing on the employer's responsibility to respond to complaints of sexual harassment. If there are no other questions, Your Honor. Thank you. Thank you. May it please the Court. Todd Hanchett for Defendant Bean Bowl Bakeries. This discussion that we've started into is all very nice from a very high level. You're in a higher court. I do acknowledge that. But it doesn't get down to the questions that actually matter in this case. This case turns on two issues. One is, was the alleged conduct severe or pervasive? And the second on the retaliation and wrongful constructive discharge claim is, was that transfer materially adverse? The answer to both of those questions is no. I thought that's what we were talking about. Well, we were talking about it in this general sense of, you know, the things that Felty would say and the things that Marshall would say. And very generally – Well, he said they said them. Now, I understand they deny having said them and Kanyo denies that he ever told him it. And it sounds to me like you have a very good chance of winning if you go back on a trial. But that's really not the question right now. Agreed. Agreed. What I'm really more getting to is, on a specific level, was this conduct – was there enough of this conduct? Was it severe enough? Was it pervasive enough? Well, what about the truck incident in particular? I'm sorry? What about the truck incident in particular backed up against whatever else had happened? The record on that incident is simply that that's what Mr. Hubbard perceived was going on. There's no evidence that Felty ever said he was running him down. Mr. Hubbard simply says, I thought he was trying to run me over. Right. It's a single, isolated incident. I think he actually says that he thought that this sort of behavior of coming awfully close to him and scaring him was not – wasn't the first time. But that then he said things in connection with that incident. And I think he said it was – he believed it was because he had rebuffed his advances. Okay. I believe is what the record says. So he also said that at that point he said things like, I want you and something about his genitalia at that point. When the truck thing was happening or right after the truck thing happened. Somewhere very close to that point in time. So why isn't that – I mean, as I said before, what is the overall sense here that these were – that there was probably nothing sexual about this. It was annoying. He was trying to annoy the hell out of this guy because he really didn't care for him and vice versa. But that also is an inference from a jury. So why isn't the truck incident enough? Enough, not in isolation, but enough given the fact that there were also other things that had gone on earlier. Because when you put this all together, and this is what I was trying to get to, when you put this all together, here's what you have. I mean, was this conduct sophomoric? Certainly. Was it offensive? Maybe. But was it severe or was it pervasive? When you look at what the record shows, Plaintiff has talked about it in terms of how these incidents happened frequently or periodically I think is the actual word. He commented about Plaintiff's tan a couple of times. That's what the record shows. Plaintiff's, I'm sorry? He commented about Plaintiff's tan a couple of times. That's what the record shows. He observed that he had lost weight, was quote-unquote looking good somewhere between two and five times. That he made smooching sounds once or twice. That he did ask him about his genitalia, that's the allegation. That only shows up once. That he got physically close to him several times. Now let's keep in mind we're talking about a time frame that is approximately a year from start to finish. And let's not forget the first complaint in this whole situation in October of 2004 was from Felty. Felty complained about Plaintiff and the way that he was being treated by Plaintiff. That's very telling in the scheme of things. And the other thing that is notable is that Plaintiff admits that Felty never touched him. We don't have the type of conduct here that rises to the level of actionable harassment. It's not sufficient to have changed the terms and conditions of his employment to unreasonably interfere. Well, on Felty's account, I mean on Hubbard's account, and again this is his account totally disputed by the defense witnesses. He says that he went to Kanye about this several times, that he was very upset by it. And that it was really interfering with his ability to work. And that he recorded it at the time. That this isn't just an after the fact version according to him. And that being the case, it persisted over time. And there was this one truck incident. So those things being the case, i.e., that this really was bothering him and according to him, and that the employer according to him did nothing about it. And that it did persist over some period of time. And it got worse. Why isn't that enough to at least get by summary judgment, even though you have umpty ump defenses to it? Well, I think it's a little bit inaccurate to say that they didn't do anything about it. The record shows several meetings in which they sat down to address what was simply a dispute between coworkers. It was not an incident, it was not an issue of harassment. And they had several conversations on this point. You're the supervisor, lead by example. And they had more than one conversation about this as they were trying to work through it. But it's sort of impossible to, I mean, it's because the accounts are so completely divergent. Since Kanye doesn't, says there was no complaint about any of these sexual comments, he therefore wasn't reacting to those in his account of what these conversations were about. Because why would he? He says they never happened. In other words, there is no evidence of any discussion or employer reaction to the sexual harassment because Kanye says that it was never reported to him. That's correct. There is a divergence of the substance of one of those meetings. But for there to have been this obligation to get into the prom-for-media-measures portion of this, even if you assume that sitting two employees down, talking to them about that they need to behave professionally, that they need to get along, that they don't have to be friends, but they need to be professional, even if you don't believe that to be any sort of remediation, the underlying conduct is still not enough to trigger actionable sexual harassment. What about the transfer? I mean, I gather that the transfer could be an actionable constructive discharge, even if there wasn't sexual harassment or a hostile work environment, if it was based on his complaints about it. Again, he says he complained about it. The employer witnesses said he didn't complain about it. But for present purposes, we have to assume that he did complain about it. So I found the actual evidence on the transfer a bit fuzzy. Because what's the name of the main supervisor? Miss Kanyo. Right, Kanyo. He doesn't quite say that he was transferring him because this other foreman had a bad back and that it was temporary and that he told him that. He really doesn't say those things. It's said by somebody else who really wasn't the person who did it. Is that right? I believe that's what reflects in the record, yes. I believe that nothing in the record from Kanyo actually comes out and says specifically it was because the other employee had a bad back. It is in the record. I believe it was through Mr. Ellis Johnson. But it does not appear specifically in the testimony of Chris Kanyo. That's correct. So why couldn't one – and he says, the defense witnesses say with some believability that it really wasn't adverse in any way. But he says it's adverse because he's going to have less – he won't be – he'll be exposed to felting less but in a more isolated and less dealable with situation. So what's wrong with that? He speculates that that would be the case. He did not stick around long enough after learning about this intention to move him over there. And you're right, there's a dispute about what the intention was, how long it was going to be for. There is an admission that they had talked about plaintiffs going over there to see the operation, to learn the operation. That's in the record. Right. But he didn't hang around long enough to get any information about what really would happen over there. He's simply guessing that things would be worse. He'd never seen the Tigard facility. He didn't talk to anybody about what happens over there. He didn't know how often Felty was over there. He simply assumed that he would be exposed to Felty more because he believed that Felty delivered over there. You say more. He said in a more vulnerable circumstance. Yes, correct. If you look at what's in the record, Felty's testimony, Felty actually mentioned in his deposition that as of his last job did, he wasn't delivering over there. So plaintiff had no basis to walk out that door on the day that he did. It was unreasonable behavior because he had no information about what the transfer involved, what would happen over there, and what the conditions would be, whether or not he would be exposed to Mr. Felty at all. Of course, he would have zero exposure to Mr. Marshall, who worked exclusively at the Beaverton facility. But for that reason, it is not materially adverse. A comment on the Nichols case. I believe Nichols involved co-worker harassment. And in that opinion, it talks about the conduct that occurred to Mr. Sanchez in that case. And Mr. Sanchez was subjected to far, far more serious taunting and comments than we have here. In fact, I believe the court describes it as a barrage of comments that occurred weekly, if not daily, and several times a day. That's distinctly different than the frequency or, frankly, the severity of conduct that is at issue in this case. It pales in comparison to that that occurred in Nichols. Unless there are further questions, I have nothing else. Thank you very much. Thank you. It would be helpful to me for you to talk about the transfer circumstance. Pardon, Your Honor? The transfer issues that we were just discussing. What basis did your client have for believing that there would in fact be more exposure or that he would be more vulnerable? Just his experience. And I was looking for any further information from that. But I don't believe that it's been rebutted that he would be at a remote location at night with three to six employees, with no higher supervisory authority. And I believe that he would really be exposed to felt he was just his surmise. Pardon, Your Honor? Whether he would actually have been exposed to felt he was his surmise. He did raise the issue with Kanyo at the time. He did. And I can't find in the record. He did? I thought he did not. Pardon? He did not raise with Kanyo at the time the objection that he would have more exposure to felt he. Did he? Yes, he did. He did raise with Mr. Kanyo at the time that it would require him to be alone with Mr. Felty. And I can find that in the record. That would be helpful. At ER 67, he told Mr. Kanyo that Tigard was an isolated situation where he would have to deal with Mr. Felty alone as there was no management or human resources at Tigard. And felt he didn't say no, you won't, because he's not going there anymore? He would not. He would not relent, and he provided no information to the plaintiff that Mr. Felty would not be there if that is even correct. And I don't concede the point. Okay. Thank you. Thank you. Do you have anything else? Unless the Court has any further questions. Thank you. Thank you very much. Thank you to counsel for a useful argument. The case of Hubbard v. Binville Bakeries will be submitted and we are in recess.
judges: Berzon, Bea, Gutierrez